## THE JOHN F. BRESNAHAN.
## THE WYOMISSING.
## THE ASHBOURNE.
## THE GRACE A. DALZELL.
## NEW YORK STEAM CORPORATION v. O'BOYLE et al.

District Court, S. D. New York.
April 5, 1932.

Alexander, Ash & Jones, of New York City (Edw. Ash, of New York City, of counsel), for libelant O'Boyle.

Frank G. Colgan, of Brooklyn, N. Y., for libelant New York Steam Corporation.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for claimant Reading Co.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (C. I. Clark and S. R. Wright, both of New York City, of counsel), for claimant Dalzell.

COXE, District Judge.

These are suits to recover for injuries to the hull and cargo of the canal boat Bresnahan sustained in a collision with the tug Grace A. Dalzell on March 14, 1929, at about 8:05 a. m. The collision occurred in a dense fog off Pier 39, Brooklyn, while the Bresnahan, with twenty-one other loaded coal boats, was tied up at the end of the pier. The boats were all in charge of the tug Ashbourne, and had been brought from Port Reading the night before, arriving at Pier 39 at 1:50 a. m. on March 14th, the morning of the collision; they were arranged in six tiers, with four boats in each of the forward tiers, and all closely hugging the shore line. The Bresnahan was the outside boat of the head tier, facing down stream, and the tug Ashbourne lay alongside of her on her starboard after quarter, with the bow of the Bresnahan projecting beyond the bow of the Ashbourne about 75 feet. Captain McCormick of the Ashbourne estimated that the four boats in the Bresnahan tier had a beam of 125 to 140 feet, and that, with the additional width of the Ashbourne, there was a total encroachment on the fairway of about 165 feet. It was also estimated that the entire length of the tow from end to end was from 700 to 800 feet.

The tug Grace A. Dalzell, in company with the tug Fred B. Dalzell, left Pacific street, Brooklyn, at 6 a. m. on March 14, bound for Erie Basin. The two tugs proceeded down the westerly side of Buttermilk Channel in a fog with a visibility of 400 to 500 feet, arriving at Erie Basin at 6:25 a. m., and remaining there until 7:53 a. m., when they left for Pier 33, Atlantic Basin. The tide was then flood, and the fog much thicker than during the trip down from Pacific street; yet the two tugs proceeded slowly on their way, the Grace A. Dalzell clinging to the pier ends, and the Fred B. Dalzell holding a course farther out in the channel, but keeping abreast of the Grace A. Dalzell.

According to Captain Woods of the Grace A. Dalzell, the fog grew dense at Conover street, and at that point the tug's engines were slowed, and the vessel was allowed to drift. The flotilla of coal boats was not seen

until the boats "loomed up about fifty feet ahead," when the engines of the Grace A. Dalzell were stopped. It was too late, however, to avoid collision, and the bow of the Grace A. Dalzell struck the bow of the Bresnahan almost head on, breaking some of the Bresnahan's bow planks. The Grace A. Dalzell was uninjured, but the Bresnahan started to fill immediately, and the Ashbourne and the Grace A. Dalzell cut her out of the tow, and together they took her to the foot of Conover street, where she was beached. While there, she sustained further injuries due to twisting before being unloaded and placed in dry dock.

■ It is conceded that the Bresnahan sounded no fog signals prior to the collision; and I am clear that it was not necessary for her to have done so as long as the Ashbourne was in charge and stationed in the immediate vicinity. The New York Marine No. 2 (Derby v. City of New York) 56 F.(2d) 756, decision of Circuit Court of Appeals, Second Circuit, March 14, 1932. Neither was it unlawful or improper to tie up as many as twenty-two barges in four-boat tiers at the end of the pier. The Youngstown (C. C. A.) 40 F.(2d) 420.

■ But did the Ashbourne give adequate warning of the presence of the tow? Captain McCormick testified that he blew three to four short whistles at intervals estimated variously at 30 seconds, 1 minute, and 1½ minutes, and that he blew more rapidly on the approach of other vessels. This testimony was corroborated by the two deck hands on the Ashbourne. It is, however, at variance with the testimony of Captain Kenny of the Bresnahan, who stated that the Ashbourne was blowing "one long and two shorts" and "as often as he heard a fog signal." Furthermore, it is contradicted by the Ashbourne's answer, in which it is alleged that the "Ashbourne blew repeated short blasts of her whistle whenever any fog signal of any vessel in the vicinity was heard, and kept blowing such signals until such vessel or vessels passed by."

For the Dalzell tug, it was denied that signals of any kind were given by the Ashbourne, and Captain Burcich, the master of a motor vessel which tied up at Pier 40 just prior to the collision, testified that he heard no signals from the Ashbourne. Burcich, however, may well have been an interested witness, as the Dalzell tug backed into his vessel after the collision, and there was a favorable settlement of the damage claim.

From testimony of such a contradictory nature, it is not easy to determine what signals were actually given; and little help is to be gained from the so-called "actor" rule, for it is difficult to understand how those on the Grace A. Dalzell could have failed to hear the Ashbourne's signals if they had in fact been given in the manner described by Captain McCormick. Moreover, it is not apparent why the Ashbourne should have been more astute to protect the head of her tow rather than the rear; and concededly there was no signal protection for the rear 700 to 800 feet away. I therefore reject Captain McCormick's testimony with respect to the signals, and find that the Ashbourne did no more than blow short whistles whenever she heard fog whistles of other vessels in the vicinity, as alleged in her answer; and under the authorities this was not enough. The Youngstown (C. C. A.) 40 F.(2d) 420; The Express (C. C. A.) 212 F. 672.

■■ I think, also, that the Grace A. Dalzell was at fault either for proceeding from Erie Basin in a dense fog, The Quogue (C. C. A.) 35 F.(2d) 683, or for navigating "faster than would permit her to stop within the distance she can [could] see ahead," New York Central R. Co. v. City of New York (C. C. A.) 19 F.(2d) 294, 295; The Express, supra; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053. In the present case, the two Dalzell tugs left Erie Basin at 7:53 a. m., in a fog so thick that Captain Burcich deemed it prudent to tie up his motor vessel at Pier 40 before proceeding to Bayonne; and, when the Grace A. Dalzell passed the dredge near the end of the slip between Piers 41 and 40, the visibility was only about 50 feet. Yet she proceeded on at a speed which could not be arrested within 50 feet; for the head of the flotilla of coal boats was only 50 feet away when first seen; and the Grace A. Dalzell struck the Bresnahan head on, with sufficient force to break in her bow, and cause her ultimately to founder.

■ I accept the testimony for the Grace A. Dalzell that she was sounding proper fog signals prior to the collision; and I think that both the Ashbourne and the Grace A. Dalzell had sufficient lookouts. With respect to the injury to the Bresnahan after she had been beached at the foot of Conover street, I think it resulted naturally from the collision, and I am unable to make any distinction between it and the damage due to the direct contact between the two vessels.

It follows that there may be a decree for the libelant in each case holding the tugs Ashbourne and Grace A. Dalzell equally at fault, with costs.